**RIFFE ASSOCIATES, INC., Plaintiff,**

v.

**DATRON SYSTEMS, INCORPORATED,
Defendant.**

**No. 74–834–AAH.**

United States District Court,
C. D. California.

Jan. 3, 1977.

Scheinman & Bell, Los Angeles, Cal., for plaintiff.

Dennis B. Haase, Visalia, Cal., for defendant.

HAUK, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The above-captioned matter having come before the Court regularly for trial on November 8, 1976, Plaintiff having been represented by Scheinman and Bell and the Defendant by Dennis B. Haase, and the Court having received oral and documentary evidence, and having fully reviewed all pleadings, including Contentions of Fact and Law submitted, the Pre-Trial Order, and the Trial Briefs of the parties, and being fully advised of the premises, now makes the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

*The Pleadings*

1. Suit was initiated by the Plaintiff by the filing of a Complaint on or about March 28, 1974. An Amended Complaint was filed on or about February 18, 1975, and the matter came to trial on the Amended Complaint. The Plaintiff states its claims against the Defendant in three counts, the first of which alleges a breach of the Representative Agreement between the parties by virtue of the Defendant's failure and refusal to pay to the Plaintiff a commission on a government procurement contract awarded the Defendant by Naval Research Laboratory of Washington, D.C. (hereinafter NRL) for 18 20-foot antenna systems (hereinafter 20-footers). The second count alleges fraudulent inducement arising out of a purported conversation between the presidents respectively of Plaintiff and Defendant in which the Defendant is alleged by the Plaintiff to have misrepresented the true monetary value of on-going work with NRL in connection with a procurement contract relating to two 48-foot antenna systems (hereinafter 48-footers). The representations were alleged to have been made in a conversation which took place prior to the parties entering into the Representative Agreement which had an effective date of November 1, 1972. A third count is based upon the Representative Agreement between the parties and requests an accounting with respect to add-ons and spares relating to the original Navy contracts, and other work which may have been performed within the geographic territory specified for Plaintiff in the Representative Agreement referred to hereinabove.

2. The Defendant denies the allegations of each of the counts stated in the Amended Complaint and asserts certain affirmative defenses, among them that the Plaintiff is precluded by the terms of the Agreement from asserting claims for commissions against the Defendant with respect to either the 18 20-footers or the 48-footers.

*Jurisdiction of the Court*

3. This Court has jurisdiction of the parties and the subject matter of this litigation pursuant to 28 U.S.C. § 1332(a). Venue is properly laid in the Central District of California by virtue of the fact that the Defendant has its principal place of business in, and resides within the Central District of California.

*Probative Evidentiary Facts*

4. Some time in early November, 1972, the precise date being unascertained, Plaintiff and Defendant entered into a Representative Agreement (PX 2) having an effective date of November 1, 1972. The Agreement, by its terms, was to be effective until October 31, 1973, and made Plaintiff its exclusive sales engineering and service representative for all products manufactured by Defendant within a territory designated as Maryland, Virginia, Ohio and Washington, D. C. However, it was the express intention of Plaintiff and Defend-

ant to exclude, from the general territory identified, certain customers with whom Defendant had an ongoing relationship at the time of the negotiations for and entry into the Representative Agreement with Plaintiff. Addendum B to the Representative Agreement specifies: NAVELEX, NAVORD, NAVSHIPS, NAVSEC, Naval Weapons Laboratory (Dahlgren) and R. F. Systems Section of Naval Research Laboratory, as such territorial exclusions. In addition to the territorial exclusions, Addendum D provided certain additional exceptions and exclusions to the Representative Agreement, namely:

"1. Any Company or Governmental Agency which are a result of current proposals outstanding, or in the process of preparation by MANUFACTURER, prior to date of this Agreement unless agreed to in writing by MANUFACTURER.

"2. Any Company or Governmental Agency which are for changes, spares or follow-on to systems or products delivered prior to the date of this Agreement or currently under contract, unless agreed to in writing by MANUFACTURER."

5. On or about October 12, 1972, Mr. Wills of Datron and Mr. Riffe of Riffe Associates, Inc. met in Mr. Wills' office in Chatsworth, California. The meeting was preliminary in nature, having as its purpose, the initial exploration of the desirability and prospects of Plaintiff becoming a Washington representative of Defendant. Both Riffe and Wills testified, and the Court so finds, that during the course of the initial October 12 meeting, various terms of the Representative Agreement were discussed in general terms, as were the various products manufactured by Datron. Riffe testified that Wills talked of a small $50,000 job at NRL being the significant ongoing job in Riffe's prospective territory. Wills' testimony departs from Riffe at this point, Wills stating that since the meeting was preliminary in nature, he quite properly refrained from discussing the details of any specific projects or jobs which were ongoing at the time within the area then contemplated to be the territory of Riffe, and in particular made no reference to any value of ongoing work. Since the value of ongoing work at the time of the meeting greatly exceeded $50,000.00, that fact, taken with the evidence as a whole, leads to the conclusion that the statement attributed to Wills by Riffe respecting a $50,000 job, was a misunderstanding, and no such representation was made.

6. At the time of the initial meeting with Riffe, Datron had already received confirmation that it was the low bidder on and would receive the contract for, construction for a di-plex antenna systems having a 48-foot dish. Datron, in fact, received contract NOO173–73–C–0486 (hereinafter the 0486 contract) on or about December 27, 1972, having an effective date of December 6, 1972.

7. Long prior to the October 12 initial meeting with Riffe at the Datron facility, Datron had initiated proposal number 22069 (Deft. Ex. B) relating to a prospective procurement, by NRL, of a number of systems (the precise number being then unknown) having dish sizes in the neighborhood of 20 feet in diameter. A subsequent memorandum to file from Jack Wills dated May 8, 1972 (Deft. Ex. C) indicated that Hearton, a scientific officer at R. F. Systems Section of NRL, believed that the system would comprise approximately 12 assemblies having approximately 19-foot dishes. In any event, the evidence establishes that Datron knew of the forthcoming procurement, had commenced work on the proposal, and that work was ongoing at the time of the initial meeting between Riffe and Wills at Datron.

8. Wills testified, and the Court so finds, that he wished to explore the possibility of Riffe's representation of Datron in the Washington, D. C. area further, but since Datron already had a representative in the same territory who was working on various special projects for Datron, Wills set up a meeting at Riffe's office for the specific purpose of introducing that representative, Joe Zuke, operating under the name and style of ECM Associates, to Riffe, to thereby avoid future conflict between the two.

9. Wills called Riffe to set up a meeting with Riffe to meet Zuke, and on October 18, 1972, after a preliminary breakfast meeting between Zuke, Bob Higgins of Datron and Jack Wills of Datron, Wills, Higgins and Zuke arrived at Riffe's business office for the previously scheduled meeting with Riffe Associates. At the meeting, Riffe was represented by its president, Fred J. Riffe and Harry Myers, also an officer of Riffe Associates.

10. Wills, Higgins and Zuke all testified that at the meeting of October 18, 1972, Zuke was identified to Riffe Associates as a representative of Datron working within the same territory contemplated to be covered by Riffe Associates, and that in particular he was working on two existing and ongoing projects within NRL, which projects were identified generally as 48-foot systems and 20-foot systems. The testimony of Wills, Higgins and Zuke is confirmed by the subsequent memorandum of Wills dated October 24, 1972, which Wills had previously dictated on the plane returning from Washington after the meeting with Riffe (Deft. Ex. D). That very important memorandum, prepared more than a year before the spectre of litigation arose, was admitted in evidence without objection, confirms the subject matter of the meeting, the substance of the discussion, and the future action to be taken to exclude Riffe. The Court finds that the purpose of the meeting with Riffe which introduced Zuke as a representative working for Datron in Riffe's contemplated territory, was clearly to acquaint him with Zuke's activities within that territory, and to assure that there would be no down stream controversy between the two. This was to be done, and was done, by excluding Riffe from the area of Zuke's ongoing efforts without unduly restricting Riffe's activities at NRL. This objective was accomplished by excluding Riffe from commissionability on work emanating from the facility from which the 20-footers and 48-footers were believed to be coming.

11. Wills, according to his and Zuke's testimony, and Defendant's Exhibit D, as-

signed to Zuke the task of determining the identity of the customer for the 20-footers, upon which Zuke was working at the time of the meeting of October 18, 1972, and of communicating that identity to Wills for the purposes of placing the same in Addendum B to thereby exclude Riffe from commissionability on that job. At the time of the October 18 meeting, Len Hearton appeared to Zuke to be the person most knowledgeable with respect to the 20-footers and the person most intimately connected with the project which eventuated in the contract for the 18 20-footers. Hearton, at that time, was the scientific officer assigned to R. F. Systems of NRL, and Zuke believed, and had every reason to believe, that the 18 20-footers would emanate from R. F. Systems Section of NRL.

12. When the Representative Agreement was received by Riffe Associates, it was reviewed by Riffe and discussed with Myers. Riffe testified that he asked Myers whether or not they did any business with R. F. Systems Section of NRL and received a negative response. Riffe made no effort to explore the matter further, and he further testified that it would have made no difference to him whether or not the exclusion had been R. F. Systems Section or Systems Development Branch at that time. The Court finds that Riffe knew, or in the exercise of reasonable and prudent business judgment should have known from the October 18 meeting, that the reference to R. F. Systems Section of Naval Research Laboratory contained in Addendum B of the Representative Agreement, was intended by Datron to identify the area in which Zuke was operating in connection with the 20-footers and 48-footers, and that its inclusion was intended by Datron to articulate the exclusion which had been discussed and agreed upon by Wills and Riffe in the October 18, 1972 meeting.

13. Riffe and Myers testified that Riffe Associates was active within NRL, and that Myers and James O'Connor, an engineer employed by Systems Development Branch of NRL were good personal friends. Indeed, Riffe testified that Myers and O'Con-

nor went to lunch on a weekly basis and Myers confirmed that statement. O'Connor, however, through his deposition which was taken by Plaintiff, indicated that the contacts were infrequent and that luncheons took place *maybe* on a once a month basis. In any event, despite the fact that there was substantial evidence that there was prior activity within NRL for more than a year with respect to the 20-footers, it appears that it was not until the advent of a luncheon between Myers and O'Connor on or about May 30, 1973, that Riffe Associates communicated to Datron that the 20-footers project was ongoing at Systems Development Branch. Riffe did testify that his firm sent a bid form to Datron in April of 1973, after seeing a notice in the Commerce Business Daily. However, neither the actual form nor a copy was ever produced, and Datron has no record of receiving it. The Potter memo of his phone call with Myers is the first evidence of Riffe's knowledge of the 20-footers and the communication of the fact to Datron. Datron had by that time been working on the project for more than a year. As Plaintiff's Exhibit 17 indicates, Myers, for the first time, called Ron Potter of Datron, indicating that Myers was to be a part of the evaluating team on the 20-footers and that an RFP advertisement respecting the project had been responded to by some 20 prospective bidders. At the same time, Myers apparently expressed some confusion as to whether or not Riffe was commissionable on the project. The Potter memo was channeled to Wills, who requested, by means of a copy of the memorandum, that Higgins respond to it by pointing out that Riffe was not commissionable on the project since it was one that had been excluded from Riffe's area of representation. The August 6, 1973 letter (PX 15) informed Riffe that Datron had been working on the project long prior to the Representative Agreement with Riffe and that it had been exempted. Riffe testified that he was "hopping mad" and called Higgins to complain. He also testified that he asked for Wills but Wills was unavailable and never returned his call. The evidence discloses that the phone call was on September 5, a considerable time after the letter was received, and Higgins, testifying from his notes respecting the phone call, indicated that no substantial complaints were voiced and that no request to speak with Wills was made. Despite the conflict in testimony as to what may have been said in the phone call, the Court finds it significant that, upon receiving confirmation from Datron by means of the letter of August 6, 1973, that Riffe would not be commissionable upon the 20-footers, that there was no preceptible action, other than a phone call a month later, taken by Riffe to object to, inquire into, or otherwise assert its position taken in this litigation, that it was commissionable upon the 20-footers prior to its letter to Datron, written subsequent to the cancellation of the agreement by Datron, that it believed that it was entitled to a commission on the job. This lack of activity is not compatible with Riffe's testimony that he was "hopping mad" at Datron's August 6 response to the Myers inquiry, or that he believed he was entitled to many thousands of dollars in commissions.

14. By letter of October 1, 1973, from R. R. Higgins at Datron to Riffe Associates, Inc., the Representative Agreement was cancelled as of November 1, 1973.

15. In early November, the precise date of which is ascertainable only by a handwritten notation indicating receipt of the document as of "November 4, 1973", Naval Research Laboratory awarded contract number N00173–74–C–0266 (hereinafter the 0266 contract) to Datron for 18 20-footer systems. Plaintiff has not sustained its burden of establishing that Datron acquired any contracts within its area of representation during the term of its agreement.

16. Datron has performed, or is in the process of performing, both the 0486 contract and the 0266 contract and all amendments thereto including add-ons, spares and the like, and has, in accordance with the agreement between ECM Associates and Datron, paid to Zuke a commission for his work in connection with the successful ac-

quisition, by Datron, of the 0486 and the 0266 contracts.

17. The Court finds that it was the intention of the parties, as expressed in the meeting of October 18, 1972, to specifically exclude the proposals then in the process of preparation at Datron referred to as the 48-footers and the 20-footers. The Court further finds that at the time of preparation of the Representative Agreement between Plaintiff and Defendant that Datron believed, and had a right to believe, that the project would result in a contract emanating from R. F. Systems Section of Naval Research Laboratories and that when that exclusion appeared in Addendum B, Riffe knew, or in the exercise of prudent business judgment should have known, that its purpose in that Addendum was to exclude the jobs discussed in the October 18, 1972 meeting. In any event, Riffe chose not to investigate further, in all probability because he knew that he was excluded and the particular identity of the facility was of no consequence to him. The fact that the 18 20-footers eventuated from Systems Development Branch and not R. F. Systems Section is of no consequence since the parties full well knew that the exclusion existed and it was the intention of the parties pursuant the October 18, 1972, meeting to exclude both the 18 20-footers and the 48-footers from Riffe's area of commissionability.

18. Should the Court accept Plaintiff's contention that the contract for the 18 20-footers eventually emanated from a section or branch of NRL not specifically identified, and further accepted Plaintiff's contention that neither Zuke, nor the prospects upon which he was working at NRL were made known to Riffe, it is clear from the evidence that Datron, from the assignment of a number to the project on March 27, 1972, deemed their effort in connection with the 20-footers as a proposal "in the process of preparation" and thus excludable under Addendum D to the Representative Agreement. Riffe conceded that he was aware that numerous companies assigned P numbers to various projects from their initiation, and considered them to be proposals

ongoing. He likewise knew, or in the exercise of prudent judgment, should have known, that Datron considered such matters as proposals in the process of preparation, from the time of assignment of a P number since Plaintiff's Exhibit 4 identifies a number of ongoing projects in terms of their P number. In this regard, Plaintiff argues that the Representative Agreement is an integrated contract, and if that be the case, Plaintiff's Exhibit 4 must be disregarded. Since neither the 48-footers nor the 20-footers were included under Addendum D, the Court finds that the contracts for the 20-footers and the 48-footers are excluded under Addendum D to the Representative Agreement.

19. Plaintiff argues that, because the contract for the 20-footers eventually emanated from Systems Development Branch, it is not excluded from Riffe's territory, and Plaintiff is commissionable, on that contract. Even if Plaintiff's argument were persuasive, the Court further finds that Datron, pursuant Paragraph 3 of the Representative Agreement, is entitled to allocate commissions as between Riffe and Zuke, and although Datron has not, in all probability, undertaken any conscious allocation process, it has nonetheless effectively allocated by paying to ECM Associates, the commission to which it is entitled in connection with the 0266 contract. Moreover, the Court finds that such allocation is justified in light of Zuke's efforts in connection with the procuring of that contract, particularly in connection with obtaining the small business set-aside which Wills attributes as a pivotal factor in connection with Datron's receiving the contract.

20. In addition, the Court finds that Plaintiff has failed to demonstrate, by a preponderance of evidence, that the statements attributable by Riffe to Wills which Plaintiff alleges constitutes fraud in connection with the 48-footers were, in fact, made, or that any statements were made by Wills or any representative of Datron in connection with the 48-footers contract which constituted fraud or negligent mis-

representation which would entitle Plaintiff to recover on its Second Cause of Action.

21. Since the Plaintiffs have failed, by a preponderance of evidence, to demonstrate their right to recover on the First Count of the Amended Complaint, they are likewise barred from recovery on the Third Count of the Amended Complaint which relates to their right to recover in connection with add-ons and spares and amendments to the 0266 and 0486 contracts, and is inextricably tied to their right to prevail on Count One.

22. To the extent that any Finding of Fact articulated hereinabove constitutes or comprises or contains a Conclusion of Law, it shall be so deemed as though set forth in the Conclusions of Law.

## CONCLUSIONS OF LAW

1. During the period commencing November 1, 1972, and up to the time of termination, a Representative Agreement, constituting a lawful, binding contract, existed by and between the parties to this litigation. The Agreement must be interpreted pursuant the laws of the State of California and the Court is obliged to interpret the contract so as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. It is likewise incumbent upon the Court to interpret the contract so as to make it lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties.

2. Giving full effect to the rules of interpretation of contracts as promulgated by the Civil Code of the State of California, the Court concludes, as a matter of law, that:

a. That the Plaintiff has failed to establish, by a preponderance of evidence, that it is entitled to recover a commission on the 0266 contract and Defendant, therefore, is entitled to judgment dismissing Count One of the Amended Complaint herein;

b. Plaintiff has failed to establish, by a preponderance of evidence, that Defendant, or any representative thereof, uttered to Plaintiff any statement with respect to any job or prospective job ongoing within Plaintiff's prospective territory as of October 12, 1972, which utterance was made with the intention to induce Plaintiff to enter into the Representative Agreement, and that Plaintiff entered into the Agreement in reliance on said utterance, which was determined to be false, and Defendant, therefore, is entitled to judgment against the Plaintiff dismissing Count Two of the Amended Complaint herein; and

c. The Plaintiff, having failed to establish his claim with respect to Count One of the Amended Complaint herein, likewise has failed to establish his right to recover in connection with the allegations of Count Three herein, and Defendant is therefore entitled to judgment against the Plaintiff, dismissing Count Three of the Amended Complaint herein.

3. To the extent that any Conclusion of Law articulated hereinabove constitutes or comprises or contains a Finding of Fact, it shall be so deemed as though set forth in the Findings of Fact.

The foregoing Findings of Fact and Conclusions of Law are made this 3rd day of January, 1977, and let judgment be entered accordingly.